IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| JO ELLA HUGHES, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 3:06-CV-0080-D |
| VS. | § | |
| | § | |
| JO ANNE B. BARNHART, | § | |
| COMMISSIONER OF | § | |
| SOCIAL SECURITY, | § | |
| | § | |
| Defendant. | § | |

<u>MEMORANDUM OPINION</u>

Jo Ella Hughes ("Hughes") brings this action under § 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), for judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for disability income benefits under title II of the Act for the closed period between July 30, 2000 to August 31, 2002. For the reasons that follow, the Commissioner's decision is AFFIRMED.

I

Hughes was born on December 8, 1954, is a high school graduate, and has past work experience as a regional sales manager, marketing director, and real estate agent. She applied for disability income benefits in September 2000, alleging that she became disabled on July 30, 2000 due to lupus, rheumatoid arthritis, and depression (the "first application"). The Commissioner denied her application initially and on reconsideration. Pursuant to Hughes's request for a hearing before

an Administrative Law Judge ("ALJ"), the ALJ held a hearing on March 20, 2002.  The ALJ issued an opinion on August 30, 2002, applying the required five-step sequential inquiry and concluding in a written decision that Hughes was not disabled.  The ALJ found at step four that Hughes could perform the essential job functions of a regional sales manager.  On October 1, 2002 Hughes sought review of that decision.

Contemporaneously, Hughes filed a new application for disability income benefits in September or October 2002,[1] again alleging that she became disabled on July 30, 2000 (the "second application").  On February 18, 2003 the Texas Disability Determination Service ("TDDS") granted her second application and determined that she had been disabled since August 31, 2002. Hughes advised the Appeals Council, which was then considering her appeal from the denial of her first application, of her success on her second application.  The Appeals Council affirmed the TDDS finding on her second application on May 28, 2004.  It also vacated the decision of the ALJ on her first application and remanded for a determination on the issue of Hughes's disability before August 31, 2002.

On December 9, 2004 and February 9, 2005, the ALJ assigned to Hughes's first application conducted a hearing at which Hughes was

---

[1]The ALJ states that the date of second application is September 18, 2002, and the Appeals Council states that it is October 28, 2002.

represented by counsel.  On May 13, 2005 the ALJ applied the five-
step sequential inquiry and concluded in a written decision that
Hughes was not disabled for the closed period between July 30, 2000
and August 31, 2002.  He found at step two that Hughes had severe
physical impairments, including inflammatory syndromes, chronic
fatigue secondary to a ruptured silicone breast implant, status-
post explantation with featured rheumatoid arthritis, lupus, and
fibromyalgia.  The ALJ also found that she had severe mental
impairments, including major depressive and generalized anxiety
disorders.  At step three, he found that her impairments were not
severe enough to meet or medically equal an impairment in the
Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.
At step four, he found that she retained the residual functional
capacity ("RFC") to "perform a full range of sedentary light
duties."  He also found that she had a related mental
limitation—that "she could understand, remember and carry out only
simple job instructions and tasks."  At step five, in which the
burden was shifted to the Commissioner, the ALJ observed that he
was precluded from finding that she was not disabled by rote
application of the Medical-Vocational Guidelines of Subpart P,
Appendix 2 because, although she could perform sedentary light
duties, she also had work-related mental limitations. Accordingly,
the ALJ posed a hypothetical question to the vocational expert
("VE"): whether there were jobs in the national economy for a

- 3 -

person with sedentary exertional capacity limitations who can understand, remember, and carry out only simple job instructions and tasks. Relying on the VE's testimony, the ALJ found that, because there were significant jobs existing in the national economy that she could have performed in the closed period, Hughes was not disabled.

On December 16, 2005 the Appeals Council declined to review the ALJ's decision on remand. The ALJ's May 2005 decision thus became the final decision of the Commissioner.

Hughes seeks judicial review of the Commissioner's denial of her application for disability income benefits for the closed period between July 30, 2000 and August 31, 2002. She contends principally that the Commissioner's decision that she retained the RFC to perform a full range of sedentary work is not supported by substantial evidence because she had serious reaching and manipulative limitations. She also posits that the decision is not supported by substantial evidence because she could only work part-time, the ALJ erroneously determined that she was not credible, and she had greater mental limitations than found by the ALJ.

II

The court's review of the Commissioner's decision is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards to evaluate the evidence. *Ripley v. Chater*, 67 F.3d 552, 555 (5th

Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam).   "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnote omitted).

"The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]." *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984).   "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez*, 64 F.3d at 173.   "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).   "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990) (per curiam)).   "To make a finding of no substantial evidence, [the court] must conclude that there is a conspicuous absence of credible choices or no contrary medical evidence." *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (internal quotation marks omitted)).   Even if the court should determine that the

evidence preponderates in the claimant's favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). The resolution of conflicting evidence is for the Commissioner rather than for this court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam).

For purposes of social security determinations, "disability" means an inability to engage in substantial gainful activity because of any medically determinable physical or mental impairment or combination of impairments that could be expected either to result in death or to last for a continuous period of not fewer than 12 months. 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, the Commissioner uses a five-step sequential inquiry. *Leggett*, 67 F.3d at 563; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 416.920(a)(4). The Commissioner must consider whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in Appendix 1, Subpart P, Regulation No. 4; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy. *Leggett*, 67 F.3d at 563 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 416.920(a)(4). "The burden of proof is on the claimant for the first four steps,

but shifts to the [Commissioner] at step five." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam)).  At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam).

"The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits." *Ripley*, 67 F.3d at 557.  "If the ALJ does not satisfy [this] duty, [the] decision is not substantially justified." *Id.*  Reversal of the ALJ's decision is appropriate, however, "only if the applicant shows that he was prejudiced." *Id.*  The court will not overturn a procedurally imperfect administrative ruling unless the substantive rights of a party have been prejudiced. *See Smith v. Chater*, 962 F. Supp. 980, 984 (N.D. Tex. 1997) (Fitzwater, J.).

III

A

Hughes first contends that the ALJ erred at step four in determining that she could perform a full range of sedentary work, because he failed to include her serious reaching, handling, and fingering limitations.  Citing *Newton v. Apfel*, 209 F.3d 448 (5th Cir. 2002), she argues that the ALJ erred in rejecting the opinions of her treating family physician and rheumatologist about reaching

and manipulative limitations.  She notes that these opinions were supported by a non-examining physician.  Conversely, she contends that the opinions of an examining physician and a non-examining psychiatrist were not substantial evidence that she did not have specific reaching, grasping, or fingering limitations.  She asserts that this error was harmful because, given her serious reaching and handling limitations, there were no significant jobs existing in the national economy that she could have performed in the closed period, and that she was therefore disabled.

B

The court will first consider her principal contention that the ALJ erroneously rejected the opinions of her treating physicians.  Jim Anagnostis, M.D. ("Dr. Anagnostis"), Hughes's treating family physician since 1995, completed an original medical source statement, in which he opined, *inter alia*, that since July 2000 Hughes could rarely or never reach, grasp, or finger with either arm.  Alan L. Brodsky, M.D. ("Dr. Brodsky"), Hughes's treating rheumatoligist since 1994, completed a medical evaluation interrogatory form in which he opined, *inter alia*, that her reaching function was affected by her impairments.  The form is dated April 13, 2002, and Dr. Brodsky stated that it was unknown when her impairments prevented her from being able to work on a continuing basis.  Hughes subsequently submitted to the Appeals Council an August 25, 2005 letter from Dr. Brodsky, in which he

stated that the reaching limitations referred to the period 2000-02.

The ALJ did not adopt the opinion of either Dr. Anagnostis or Dr. Brodsky regarding Hughes's residual functional limitations, although he noted that both had treated her for over ten years.  He found that the limitations described by both physicians were generally inconsistent.  The ALJ stated that "Dr. Brodsky did not provide an estimate of the date these limitations and restrictions began."  R. 19.  He observed that the forms were boilerplate, "were not prepared for legitimate medical purposes of diagnoses or treatment, no physician arranged a functional capacity evaluation and neither psychiatrist referred to diagnostic test or clinical observation as he completed the form."  *Id.*  He went on to find that Hughes "did not frequently seek care from Dr. Brodsky or Dr. Anagnostis" during the closed period, and that "Dr. Anagnostis's notes show few examples of fibromyalgia-related symptoms."  *Id.*  Finally, the ALJ observed that Dr. Anagnostis "suggested limitations and restrictions that even claimant did not endorse in the closed period."  *Id.*

C

1

"A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is 'well-supported by medically acceptable clinical and laboratory

diagnostic techniques and is not inconsistent with . . . other substantial evidence.'"  *Newton*, 209 F.3d at 455 (ellipsis in original) (quoting *Martinez*, 64 F.3d at 176).  Nevertheless,

> [e]ven though the opinion and diagnosis of a treating physician should be afforded considerable weight in determining disability, the ALJ has sole responsibility for determining a claimant's disability status. The ALJ is free to reject the opinion of any physician when the evidence supports a contrary conclusion. The treating physician's opinions are not conclusive. The opinions may be assigned little or no weight when good cause is shown. Good cause may permit an ALJ to discount the weight of a treating physician relative to other experts where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence.

*Newton*, 209 F.3d at 455-56 (citations, quotation marks, and brackets omitted).

This court has also held that, absent a contradictory opinion of another examining or treating physician, the ALJ must analyze a treating physician's opinion in light of six factors contained in 20 C.F.R. § 404.1527(d) before giving little or no weight to that opinion. *E.g., Parham v. Barnhart*, No. 3:05-CV-1043-D, slip op. at 17-18 (N.D. Tex. Apr. 28, 2006) (Fitzwater, J.). Under 20 C.F.R. § 404.1527(d), the ALJ must consider the following six factors

> (1) the physician's length of treatment of the claimant, (2) the physician's frequency of examination, (3) the nature and extent of the treatment relationship, (4) the support of the physician's opinion afforded by the medical evidence of record, (5) the consistency of the

opinion with the record as a whole; and (6)
the specialization of the treating physician.

*Id.* at 17 (quoting, *inter alia*, *Newton*, 209 F.3d at 456) (internal
quotation marks omitted). "Several federal courts have concluded
that an ALJ is required to consider each of the § 404.1527(d)
factors when the ALJ intends to reject or give little weight to a
treating specialist's opinion." *Newton*, 209 F.3d at 456
(collecting cases).

2

In rejecting the opinions of the treating physicians——Drs.
Anagnostis and Brodsky——the ALJ cited the controlling regulations
and rulings, including 20 C.F.R. § 404.1527 and *Titles II and XVI:
Giving Controlling Weight to Treating Source Medical Opinions*, 61
Fed. Reg. 34,490 (July 2, 1996) ("SSR 96-2p"), and also considered
the contradictory opinions of an examining physician and a non-
examining psychiatrist who had prior experience in internal
medicine and remained current in the field.[2]  Although the ALJ did
not explicitly state that he was considering each of the six
factors, he addressed each of them in rejecting their opinions.

First, he observed that both physicians had treated Hughes for
over ten years.  Second, he concluded that Hughes "did not

---

[2]This case does not present the question whether an ALJ may
properly reject the treating physician's opinion in light of a
contradictory examining physician's opinion and ignore the six
factors under 20 C.F.R. § 404.1527.  Here, the ALJ considered both
the factors and the opinion of an examining physician.

- 11 -

frequently seek care from Dr. Brodsky or Dr. Anagnostis in the closed period."[3]   Third, as to the nature and extent of the treatment relationship, the ALJ considered the long-term relationship between Hughes and both physicians.

The ALJ focused his rejection of the treating physicians' opinions on factors 4 and 5. As to factor 4, he noted that neither physician "referred to [a] diagnostic test or clinical observation." R. 19.   He also observed that, contrary to the physician's opinions, Dr. Brodsky's June 2001 examination revealed no joint swelling "and Dr. Anagnostis' notes show few examples of fibromyalgia-related symptoms." *Id*.

As to factor 5, the ALJ found that the opinions of Dr. Brodsky and Dr. Anagnostis were inconsistent with each other, with Hughes's characterization of her own limitations, and with the opinions of two other physicians.  For instance, Dr. Brodsky opined that Hughes could only lift 10-15 pounds occasionally, stand or walk a total of 1-2 hours per day and continuously for ½ hour, and sit for a total of 4 hours per day and continuously 1-2 hours.  By contrast, Dr. Anagnostis opined that she could rarely or never lift any weight, stand or walk a total of 1 hour per day and continuously for fewer than 15 minutes, and sit for a total of 1 hour per day continuously

---

[3]The evidence reflects that Dr. Brodsky examined Hughes four times between January 2001 and April 2002.  The evidence also shows that Dr. Anagnostis examined Hughes twice during the closed period, in May 2001 and March 2002.

for fewer than 15 minutes.  Moreover, Dr. Anagnostis opined that Hughes could rarely or never reach, grasp, or finger with either arm, whereas Dr. Brodsky concluded that her impairments affected her ability to reach but not to finger or handle.

The ALJ also observed that Dr. Anagnostis's suggested limitations and restrictions were inconsistent with Hughes's own assessment of her limitations.  Hughes testified that she could not lift or carry items over 20 pounds more than occasionally, whereas Dr. Anagnostis opined that she could never or rarely lift any weight.

Furthermore, the ALJ found that the treating physicians' opinions were inconsistent with the evaluation of an examining physician, Sudhakar Rumalla, M.D. ("Dr. Rumalla"), who determined that Hughes could "perform light work activities where she is not involved in heavy lifting and prolonged walking."  Hughes contends that Dr. Rumalla's opinion is not *inconsistent* with the opinions of her treating physicians because he did not offer a specific opinion about her abilities to reach, grasp, and finger.  Although Dr. Rumalla did not expressly opine that Hughes had no reaching or manipulative limitations, his ultimate conclusion that Hughes could perform sedentary work did not include any other limitations on her abilities.  Accordingly, his conclusion was not consistent with the opinions of her treating physicians that she had additional reaching limitations.  Moreover, in determining Hughes's functional

capacity, the ALJ not only considered Dr. Rumalla's ultimate conclusion but also his supporting observations that Hughes had fair grip strength and normal upper extremity ranges of motion. Finally, the ALJ found that the treating physicians' opinions were inconsistent with the opinion of the non-examining psychiatrist, John Simonds, M.D. ("Dr. Simonds"), who concluded that Hughes was capable of performing light work duties during the closed period.[4]

As to factor 6——the specialization of the treating physicians——Hughes makes much of the fact that the ALJ mistakenly referred to Dr. Anagnostis as a psychiatrist and to Dr. Brodsky as a psychiatrist and a neurologist. At the outset of his opinion, however, the ALJ correctly identified both treating physicians' specialties, referring to Dr. Anagnostis as Hughes's primary care physician and to Dr. Brodsky as her rheumatologist. He thus adequately accounted for the specializations of both physicians.

In sum, unlike *Newton*, 209 F.3d at 458, this is not a case

---

[4]This is not a case in which the ALJ relied solely on the testimony of a non-examining psychiatrist to reject the testimony of treating physicians who specialize in the relevant field of medicine. The court therefore has no reason to disturb the Commissioner's decision on this basis. *Cf., e.g., Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (per curiam) ("'This is a case where the ALJ summarily rejected the opinions of [Myers's] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant.'" (quoting *Newton*, 209 F.3d at 458)); *Mayo v. Barnhart*, No. 3:03-CV-0652-D, slip op. at 12 (N.D. Tex. Apr. 21, 2004) (Fitzwater, J.) (vacating and remanding where, *inter alia*, ALJ relied on opinion of examining doctor physician who specialized in physical medicine and rehabilitation to reject opinion of treating physician who specialized in relevant medical speciality of psychiatry).

"where the ALJ summarily rejected the opinions of [Hughes's] treating physician[s], based only on the testimony of a non-speciality medical expert who had not examined the claimant." Rather, in rejecting the opinions of Hughes's treating physicians, the ALJ comprehensively considered all six factors outlined in § 404.1527(d) and weighed the contradictory opinion of an examining physician.

D

Hughes folds her arguments about the ALJ's failure to defer to her treating physicians into her contention that the ALJ's ultimate conclusion is not supported by substantial evidence. Throughout this section of her brief, she posits miscellaneous contentions that the ALJ's conclusion that she was able to do sedentary work without reaching or manipulative limitations is not supported by substantial evidence. For instance, she asserts that Dr. Rumalla in fact found abnormalities related to upper extremities, e.g., her grip was fair but not good, and that he did not consider the combined impact of her impairments. She also contends that the ALJ's reliance on Dr. Simonds's assessment of her functional capacity limitations was erroneous because he is a child psychiatrist. Finally, she contends that her reaching and manipulative limitations were further supported by the opinion of James A. Wright, M.D. ("Dr. Wright"), a non-examining, consultative state agency physician.

These contentions amount to an argument that the ALJ erroneously weighed the evidence in determining that she could perform all sedentary work. This court, however, "may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]." *Kane*, 731 F.2d at 1219. Moreover, the court has already concluded that there was sufficient evidence in the record that contradicted the treating physicians' opinions that Hughes had specific reaching limitations. *See supra* at § III(C)(2). This same evidence constitutes substantial evidence that supports the ALJ's determination that Hughes did not have particular reaching or manipulative limitations apart from her general ability to only perform sedentary work. Accordingly, the court holds that the ALJ's conclusion that Hughes had the RFC to perform sedentary work is supported by substantial evidence.

IV

The court will next consider the three arguments Hughes raises at the end of her brief regarding part-time work, credibility, and mental limitations.

A

Hughes labels her first argument as "*Part-time work*: Hughes is clearly disabled at all relevant times." She contends that the ALJ erroneously evaluated various medical opinions, that she is clearly disabled when those opinions are considered, and that the ALJ erroneously evaluated her treating physicians' opinions that she

could not work full-time.  She maintains that a claimant is disabled if she can only work part-time, and that substantial evidence does not support the ALJ's finding that she could not work full-time.  Finally, she urges that, on remand, the ALJ should consider the treating physicians' "part-time work opinions."

The court rejects this contention because it merely repeats arguments already made, i.e., that the ALJ erroneously concluded that she could perform sedentary work.  As to her statements regarding part-time work, she does neither explain how they relate to errors in the ALJ's reasoning or conclusions nor identifies the applicable standard of review.  In fact, she does not make clear what constitutes the treating physicians' "part-time work opinions."  Accordingly, the court finds that this argument lacks merit.

B

Hughes next contends that substantial evidence does not support the ALJ's adverse credibility finding.  She alleges that, under 20 C.F.R. § 404.1529(c)(3)(i), the ALJ was required to consider her daily activities, which he did not do.  She urges that the ALJ erroneously presumed that she was not credible.  Finally, she argues that the ALJ misstated the issue in finding that Hughes was not credible because she was not so severely impaired as to preclude her from performing all work activities.

First, the ALJ specifically noted the governing regulation, 20

C.F.R. § 404.1529, and stated that he had evaluated her daily activities.  Despite Hughes's contention that she was totally disabled, the ALJ observed that she had related that she drove four times per week.  She went to the store to pick up medications and to shop for clothes, to dinner on weekends (spending 40 minutes to one hour at restaurants), and to movies several times per year. Accordingly, the court concludes that the ALJ not only recognized the governing regulation but considered Hughes's relevant daily factors in weighing her credibility.

Second, the ALJ did not presume that Hughes was not credible; rather, he described her testimony as "innately biased."  The court discerns no reversible error in this use of adjectives to describe the testimony of a social security claimant seeking benefits. Moreover, the ALJ identified the applicable guidelines— *Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements*, 61 Fed. Reg. 34483-01 (July 2, 1996) ("SSR 96-7p")—and described several inconsistent statements Hughes made regarding the nature and extent of her disability.  The court thus concludes that the ALJ did not err in concluding that she "impugned her credibility."

Third, the ALJ did not find that Hughes was not credible for the reason that she was not so severely impaired as to preclude the performance of all work activities.  Rather, he concluded that her credibility had been "impugned" because some of her statements

- 18 -

about her pain and exertional abilities were inconsistent with prior statements she had made to physicians.  Accordingly, the court rejects her contentions that the ALJ erred with respect to determinations regarding her credibility.

C

Finally, Hughes argues that the ALJ erred both in determining her mental RFC and in the corresponding hypothetical posed to the VE.  Specifically, she alleges that the administrative record is defective because it does not include the July 1, 2005 statement of Puskoor Kumar, M.D. ("Dr. Kumar"), her treating psychiatrist.  And she urges that Dr. Kumar's opinions submitted to the Appeals Council demonstrated that the ALJ understated the severity of her mental condition.  She points to Dr. Kumar's opinion that, "shortly before she stopped treating with me [in early 2001], her ability to focus or maintain attention was extremely deteriorated, so that she was not even able to perform one to two step tasks at home during certain times of the day."  P. Br. 23.

The administrative record is not defective.  Hughes properly submitted Dr. Kumar's July 1, 2005 statement to the Appeals Council and the Appeals Council considered it.  The statement was inadvertently omitted from the record submitted to this court. Hughes attached the statement to her brief, and the Commissioner does not object to this attachment.  Accordingly, there is no error in the administrative record that requires reversal.

- 19 -

As to her contention that her mental limitations were greater than those the ALJ found, she does not identify the applicable legal standard. Generally, when a social security plaintiff "'does not otherwise identify the legal standard under which she seeks review, the court . . . will address her arguments under the settled principles that resolution of conflicting evidence is for the Commissioner and that the court must affirm the Commissioner's findings if they are supported by substantial evidence.'" *Parham*, No. 3:05-CV-1043-D, slip op. at 11 (alterations in original omitted) (quoting *LeCoq v. Barnhart*, No. 3:04-CV-0825-D, slip op. at 12 (N.D. Tex. Aug. 24, 2005) (Fitzwater, J.)). The Commissioner points to ample evidence that supports the ALJ's conclusion that Hughes "could understand, remember and carry out only simple job instructions and tasks." The ALJ relied on the opinion of Dr. Kumar and the opinions expressed by consulting physicians, Dr. Simonds and Murray Skaggs, M.D. ("Dr. Skaggs"). The ALJ found that although Hughes had severe depression and anxiety during the closed period, she had not required neither psychiatric in-patient care or assisted living services, nor frequent out-patient counseling; none of her treating physicians referred her for psychiatric care after July 1, 2001; and she had not sought additional counseling. He further noted that she was neither taking anti-psychotic medication nor was there any "indication of gross emotional irregularities, cognitive limitations or social isolation nor is there a confirmed

history of bizarre, aberrant or harmful behavior."

Accordingly, the court holds that the ALJ's conclusion about her mental capabilities is supported by substantial evidence, and it rejects her final contention.[5]

\*    \*    \*

The Commissioner's decision is AFFIRMED.

August 22, 2006.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

---

[5]Hughes does not base a claim of error on the ALJ's failure to address the six factors under § 404.1527(d) in rejecting the opinion of her treating physician, Dr. Kumar. Moreover, such an argument would be misplaced where the ALJ did not reject Dr. Kumar's diagnosis. *See* R. 20 ("I have concluded that the depression and anxiety were severe in the closed period . . . .").